**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANJANETTE YOUNG,                       )
                                       )
   Plaintiff,           )
                                       )
  vs.                         )  Case No. 1:19-cv-05312
                                       )
CITY OF CHICAGO, *et al.*,             )
                                       )  Hon. John J. Tharp, Jr.,
   Defendants,          )   Judge Presiding.
                                       )
  and.                        )
                                       )
KEENAN J. SAULTER,                     )
                                       )
   Respondent.          )

**RESPONDENT KEENAN J. SAULTER'S SUPPLEMENTAL BRIEF**
**RELATED TO ISSUES RAISED AND/OR DISCUSSED ON DECEMBER 22, 2020**

Respondent Keenan J. Saulter, by his attorneys, Sandberg Law Office, P.C., through Craig M. Sandberg, and the Law Offices of Rahsaan A. Gordon, P.C., through Rahsaan A. Gordon, hereby submits his invited brief to supplement issues discussed on December 22, 2020. (DE 51)[1] In support thereof, the plaintiff states as follows:

**I. OVERVIEW**

1. Respondent Saulter submits this filing in response to the Court's order directing him to provide the legal, factual, and equitable reasons why he should not be subject to a rule to show cause. As explained below, the Court should neither sanction nor issue a rule for the following primary reasons: (1) Respondent Saulter had a good-faith belief that disclosing the videos would not violate the protective order, and while Saulter appreciates that he should have proceeded differently, he did not act in willful violation of the order, as required for any finding of contempt; (2) Respondent Saulter was open with the Court when the Court requested he provide an explanation, and was not provided the procedural

protections required for any finding of indirect criminal contempt, which is the only form of contempt that is potentially applicable; and (3) the order in question was entered solely for the benefit of the City, and the City has since effectively admitted that the videos, which show painful mistreatment of an African-American woman by Chicago police officers, should not have been made subject to a protective order, and this equitable consideration counsels strongly against issuing a rule to show cause.

2.      This Court has offered, and Respondent Keenan J. Saulter accepts, the opportunity to formally address the concern raised by this Court during the December 22, 2020 hearing related to the "Agreed Confidentiality Protective Order" ("Protective Order" or "PO") (DE 35), the production of the fourteen (14)[2] Chicago Police Department ("CPD") Body-Worn Camera videos made to Plaintiff in February 2020, and the recent disclosure of these public-interest videos by Respondent Saulter.

3.      This cause arises out of the February 21, 2019 execution of a search warrant on Ms. Anjanette Young's home by Chicago Police Department ("CPD") officers that was based solely on an anonymous informant. In the course of executing the warrant, CPD officers forced Ms. Young to stand naked and handcuffed for approximately 40 minutes in the presence of a dozen male (all non-African-American) officers before admitting they were at the wrong home.

4.      As described in greater detail below, prior to entry of the subject "Agreed Confidentiality Protective Order" (DE 35) in February 2020, on November 1, 2019, Ms. Young (individually) submitted an Illinois Freedom of Information Act ("FOIA") request to the Chicago Police Department for "any and all video recorded from officers' body worn

---

[1] Citations made to the docket will be denoted as "DE ____.

[2] At the December 22nd hearing, this Court mentioned that it learned (not from the City, but by "news reports") of additional videos that "should have been produced but were not." (DE 52 at p4, lines 8-14) In fact, the City has acknowledged that there were twenty (20)

cameras during a search warrant that was executed on my home, 164 N. Hermitage Ave., 1st floor apartment, on February 21, 2019." That request was denied by the City of Chicago, on November 19, 2019.

5. For the reasons set forth below, this Court should not issue a rule to show cause, whether for sanctions or for contempt against Respondent Saulter.

6. Further, for the reasons set forth below, Respondent Saulter should not be held in any form of contempt (direct criminal contempt, indirect criminal contempt, direct civil contempt, or indirect civil contempt).

7. Further still, for the reasons set forth below, Respondent Saulter should not be subject to any sanctions.

8. Below is a careful, case-specific consideration (factual, legal, and equitable) of the character of the conduct at issue.

## II. INHERENT POWER TO ISSUE SANCTIONS, AND CRIMINAL OR CIVIL CONTEMPTS

9. At the December 22, 2020 hearing, this Court indicated it was, *sua sponte*, "giving consideration to issuing a rule to show cause why Mr. Saulter should not be held in contempt" (DE 52 at p5, lines 6-8) for violating this Court's February 20, 2020 Order (DE 35). Currently, there are no pending motions against Respondent Saulter because the City sought to withdraw its motions, which was granted by this Court. (DE 50)

### A. Legal Framework of the Court's Power to Sanction.

10. The Seventh Circuit "has recognized the need to be cautious when resorting to inherent powers to justify an action, particularly when the matter is governed by other procedural rules, lest (even in the absence of a direct conflict) the restrictions in those rules become meaningless." *Kovilic Constr. Co., Inc. v. Missbrenner*, 106 F.3d 768, 772-73 (7th

---

body worn camera videos, but only produced the subject fourteen (14) body worn camera videos when it was directed to do so by this Court.

Cir. 1997) (citing *G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir. 1989) (*en banc*)).

11.     In accordance with this rationale, the Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) stated that courts should ordinarily rely on the Rules rather than their inherent power, "[b]ut if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent powers." "At the very least, the inherent power must continue to exist to fill in the interstices. *Id*. at 46.

12.     A district court has inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. "Sanctions meted out pursuant to the court's inherent power are appropriate where the offender has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 793 (7th Cir. 2009) (emphasis added); *Trade Well Int'l v. United Cent. Bank*, 778 F.3d 620, 627 (7th Cir. 2015) ("[S]anctions under the court's inherent power should not be imposed unless there is [1] bad-faith conduct or [2] willful disobedience of an order."). "Negligence…is not enough to support a finding of bad faith." *Trade Well Int'l*, 778 F.3d at 627. A district court must exercise causation and restraint in exercising its inherent power to sanction. *Salmeron.*, 579 F.3d at 793.

13.     As explained in greater detail herein, Respondent Saulter never willfully abused the judicial process or otherwise conducted litigation (or himself) in bad faith.

14.     When a court exercises its inherent powers, it has a range of potential sanctions which include issuing an admonition or censure, requiring participation in continuing legal education programs, referring the matter to appropriate disciplinary authorities, ordering remedial actions to be taken, or ordering a fine payable to the court. None, however, are warranted in this matter.

**B.**    <u>Contempts (Criminal vs. Civil).</u>

15.    Contempt is different. "'Contempt' is '[c]onduct that defies the authority or dignity of a court or legislature'" *Hastert v. Westport Ins. Corp.*, 421 F. Supp. 3d 946, 955 n.9 (D. Haw. 2019) (citing BLACK'S LAW DICTIONARY (11th ed. 2019)). Contempt proceedings are often classified as *sui generis*. *Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966). Contempt of court is classified in two ways: the contempt may be deemed civil or criminal, and the contempt may be direct or indirect. Thus, there are four types of contempt: direct criminal contempt, direct civil contempt, indirect criminal contempt, and indirect civil contempt. A direct contempt takes place in the presence of the judge, whereas an indirect contempt takes place outside the presence of the judge. Thus, the distinction between indirect and direct contempt depends on the act of contempt. Unlike a direct contempt, indirect contempt may <u>not</u> be summarily punished.

16.    One way to determine whether a contempt is criminal or civil is (typically) to look to the type of sanction imposed (or considered). Whether a contempt is criminal or civil turns on the "character and purpose" of the sanction involved. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911). The Supreme Court reviewed the difference between these two types of proceedings in *Union Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 114 S. Ct. 2552 (1994). Citing *Gompers*, 221 U.S. at 441, the Court stated that "a contempt sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Bagwell*, 512 U.S. at 827-28 (internal quotation marks omitted). The type of sanction imposed would usually be outcome determinative as to how any reviewing court looks at a matter.

17.    As the Ninth Circuit explained it, "[t]he primary purpose of criminal contempt is to punish past defiance of a court's judicial authority, thereby vindicating the court," while

"[c]ivil contempt is characterized by the court's desire to compel obedience to a court order or to compensate the contemnor's adversary for the injuries which result from the noncompliance." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983) (citation omitted). The line between the two forms of contempt is not always clear. As applied to fines, however, *Bagwell* held that a flat, unconditional fine totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance. *Bagwell*, 512 U.S. at 829. Last, the *Bagwell* Court reviewed the procedures that due process requires before any particular contempt penalty may be imposed. *Bagwell*, 512 U.S. at 830-34. For that purpose, it distinguished between direct contempt, occurring in the court's presence, and indirect contempt, occurring out of court. *Bagwell*, 512 U.S. at 827 n.2.

18.    Importantly, the first time this Court mentioned "criminal" contempt was at page 19 of the 26-page hearing transcript. (DE 52 at p19, lines 10-11) That was in response to Mr. Saulter seeking confirmation that the Court was only looking at potentially "civil" contempt. (DE 52 at p19, lines 6-9) Further, this was after Respondent Saulter spoke on his own behalf, both apologizing and providing a degree of explanation.

19.    As to what type of contempt it was contemplating, this Court stated "[t]here's a lot of case law on the distinction between civil and criminal contempt" (DE 52 at p19, lines 10-11), it was <u>not</u> concerned about compensating the City (DE 52 at p19, lines 13-14), and its concern related to "vindication of its -- and its own interest institutionally with the enforcement -- compliance with and enforcement of its orders" (DE 52 at p19, lines 14-17).

20.    Given the procedural differences which are discussed below between civil and criminal contempt, the applicable caselaw requires that if a court is considering criminal contempt against a party—that the court must provide appropriate safeguards.

21.     Initially, at the December 22, 2020 hearing, this Court stated, "The Court is giving consideration to issuing a rule to show cause why Mr. Saulter should not be held in contempt. But before going down that path, I wanted to give Mr. Saulter an opportunity to address any of these issues and to provide any arguments he may have as to why this is or is not the appropriate course of action here." (DE 52 at p5, lines 6-12).

22.     Because different substantive and procedural rules apply to civil and criminal contempt, distinctions between the two forms of contempt are important. Outside of a few (inapplicable to the instant matter) exceptions, the Supreme Court has consistently distinguished between criminal and civil contempt, the former being a vindication of the authority of the courts and latter being the preservation and enforcement of the rights of the parties.

### 1.     *Criminal contempt.*

23.     The Supreme Court has held that "[c]riminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201 (1968), and that "criminal [contempt] penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt." *Hicks v. Feiock*, 485 U.S. 624, 632 (1988). For example, a person cannot be convicted of criminal contempt without being informed of his right to counsel, *Fed. Trade Comm'n v. Trudeau*, 579 F.3d 754, 769 (7th Cir. 2009), and it is plain error for a judge to act as both prosecutor and decision maker in a criminal contempt proceeding. *United States v. Griffin*, 84 F.3d 820, 829 (7th Cir. 1996) (noting that the "crucial determinant" of whether appropriate procedural protections have been afforded in a criminal contempt proceeding is "the extent of the judge's intrusion" into the authority of the executive branch to prosecute crimes).

24.     A proceeding regarding criminal contempt demands "deliberateness and caution." *United States v. Turner,* 812 F.2d 1552, 1568 (11th Cir. 1987). "Although the potential for the issuance of a criminal contempt citation lurks in every case, they are not the usual grist of the district court. They are, in fact, rare proceedings indeed…." *United States v. Ortiz*, 84 F.3d 977, 979 (7th Cir. 1996).

25.     The federal criminal contempt statute, which prescribes those acts for which a federal court may hold a party in contempt, states that there must be "[d]isobedience or resistance to [the court's] lawful writ, process, *order*, rule, decree, or comment" to hold a party in contempt. 18 U.S.C. § 401 (emphasis added). "[C]riminal contempt requires willfulness." *United States v. Trudeau*, 812 F.3d 578, 591 (7th Cir. 2016). "Section 401 recognizes two types of contempt: direct and indirect. Direct contempt is contumacious conduct committed in the actual presence of the court and may be punished summarily. All other contempt must be treated as indirect contempt." *United States v. Britton*, 731 F.3d 745, 749 (7th Cir. 2013) (internal citations and quotes omitted).

26.     The Supreme Court, commenting on this statute in *In re McConnell*, 370 U.S. 230 (1962), explained that this provision was enacted by Congress "in order to correct serious abuses of the summary contempt power that had grown up…revealing a Congressional intent to safeguard Constitutional procedures by limiting courts…to the least possible power adequate to the end proposed." *In re McConnell*, 370 U.S. at 233-34 (internal citation and quotes omitted).

27.     "A criminal contempt charge is…a separate and independent proceeding at law that is not part of the original action." *Cooter Gell v. Hartmark Corp.*, 496 U.S. 384, 396 (1990). "A sanction in criminal contempt is appealable forthwith on the theory that it is the terminating order of a separate proceeding, the criminal prosecution." *Powers v. Chicago Transit Auth.*, 846 F.2d 1139, 1141 (7th Cir. 1988).

28.     "A contempt order is considered…criminal if its purpose is to punish the contemnor, vindicate the court's authority, or deter future misconduct." *In re Grand Jury Proceedings*, 280 F.3d 1103, 1107 (7th Cir. 2002). Criminal contempt, unlike civil contempt, implicates procedural rights attendant to prosecutions. *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 280 (2010).

29.     These constitutional protections include the right (1) not to be subject to double jeopardy, *see United States v. Dixon*, 509 U.S. 688, 695 (1993); *In re Bradley*, 318 U.S. 50 (1943); (2) to receive notice of the charges, (3) to receive assistance of counsel; (4) to receive summary process; (5) to present a defense, *Cooke v. United States*, 267 U.S. 515, 537 (1925); (6) not to self-incriminate oneself, and (7) to proof beyond a reasonable doubt, *Gompers*, 221 U.S. at 444.

30.     For serious criminal contempt involving imprisonment of more than six months, these protections include the right to a jury trial. *Bloom*, 391 U.S. at 199. In sum, "criminal contempt sanctions are entitled to full criminal process." *Bagwell*, 512 U.S. at 833 (citing *Hicks*, 485 U.S. at 632).

31.     In the instant case, this Court did not (either prior to the proceedings on December 22, 2020, or during those proceedings) advise either Respondent Saulter or his counsel that it was considering "criminal" contempt.

32.     Further, this Court did not advise Respondent Saulter of his Fifth Amendment right against self-incrimination.

33.     As such, this matter, clearly, did not proceed from its inception as though it were a criminal proceeding or that criminal proceedings were contemplated.

34.     The aforementioned background, thus, was to aid in its contrast with civil contempt.

**2.** *Civil contempt.*

35. By contrast, civil contempt sanctions, which are designed to compel future compliance with a court order, are coercive and (usually) avoidable through obedience, and "thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *Int'l Union, Union Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 114 S. Ct. 2552, 2557 (1994). In *Bagwell*, the Supreme Court stated that "a contempt sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Bagwell*, 512 U.S. at 827-28 (internal quotation marks omitted).

36. "Due process requires that a person facing contempt sanctions be given adequate notice and fair opportunity to be heard in civil contempt proceedings. This minimally includes a requirement that notice be given of the time and place of hearing on the propriety of a contempt order." *U.S. Sec. & Exch. Comm'n v. Hyatt,* 621 F.3d 687, 694 (7th Cir. 2010) (internal citations and quotes omitted). The Seventh Circuit has said that a court's "inherent power to sanction is to be exercised by means of a rule to show cause or similar procedure, rather than by the sudden imposition of sanctions with no opportunity to respond." *Larsen v. City of Beloit*, 130 F.3d 1278, 1286-87 (7th Cir. 1997).

37. "Civil contempt is 'a unique civil sanction because its aim is both coercive and compensatory.'" *Hyatt,* 621 F.3d at 695 (citing and quoting *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008)). Here, this Court stated that "the Court's concern is not compensation to the City. The Court's concern is vindication of its -- and its own interest institutionally with the enforcement -- compliance with and enforcement of its orders." (DE 52 at p19, lines 8-14) (emphasis added)

38.    Celia Meza, Acting Corporation Counsel on behalf of the City of Chicago, requested the Court "not impose any sanctions against Mr. Saulter". (DE 52 at p8, lines 8-15)

39.    Further, today (January 15, 2021) Celia Meza and City of Chicago Mayor Lori E. Lightfoot reiterated the City of Chicago's position that Mr. Saulter should not be sanctioned. (DE 55)

40.    Specifically, in a letter to the Court, City of Chicago Mayor Lori E. Lightfoot stated:

> I write to Ask the court to not seek sanctions against attorney Keenan Saulter in the above matter.
>
> Since the city withdrew its ill-advised motion to Enjoin CBS from violating the Court's Confidentiality Order and Motion for Sanctions Against Plaintiff on December 14, 2020, I have personally learned more about the underlying case at issue and I had the opportunity to have an extended conversation with Ms. Anjanette Young and her council Attorney Saulter (with City Council present as well). On the basis of that interaction and other information that has come to me about Attorney Saulter, I believe that his conduct regarding the videos at issue in this matter was an aberration.
>
> I take my role as an officer of the court very seriously, as all lawyers should. I recognize that a letter of this type, from someone in my position is unusual. Nonetheless, I felt compelled to share my personal belief regarding the conduct by Attorney Saulter that is under consideration. As you are aware, 2020 was an extraordinarily difficult year for our city. The contents of the video showing officers in Ms. Young's home, and the particular circumstances she was forced to endure were very hard to watch, and for me, they were frankly gut-wrenching. The whole circumstance added to a significant burden of trauma, fear and mistrust that many of our residents were already bearing. Our city needs to heal and get to a better place on this and a number of other issues as this new year begins.
>
> I appreciate the court's consideration.

(DE 55-1)

41.    The above-referenced considerations are important because "the Federal Rules of Civil Procedure provide that a district court may order a party to pay attorney's fees 'caused by' discovery misconduct, Rule 37(b)(2)(C)...." *Goodyear Tire & Rubber Co. v.*

*Haeger*, 137 S. Ct. 1178, 1186 n.5 (2017). Here, this is not being sought and is, specifically, being disavowed by the City.

42.     Since a contempt sanction is considered civil if it "is remedial, and for the benefit of the complainant, *Gompers,* 221 U.S. at 441, when the complainant is the Court, a non-monetary sanction could include something that would benefit the Court, *i.e.*, a presentation to young lawyers about protective orders or a presentation regarding the federal courts to a school or civic group.

43.     Because of the seriousness of a finding of contempt, the contempt must be proven by "clear and convincing evidence." *In re Sterling*, 933 F.3d 828, 832 (7th Cir. 2019). The Seventh Circuit has held that "'highly probable'…is the Supreme Court's definition of…'clear and convincing evidence.'" *Von Gonten v. Research Sys. Corp.*, 739 F.2d 1264 (7th Cir. 1984) (citing and quoting *Colorado v. New Mexico*, 467 U.S. 310 (1984))

44.     "To prevail on a request for a contempt finding, the moving party must establish [each of these four matters] by clear and convincing evidence:

> (1) Highly probable that "a court order set forth an unambiguous command";
> (2) Highly probable that "the alleged contemnor violated that command";
> (3) Highly probable that "the violation was significant, meaning the alleged contemnor did not substantially comply with the order"; and
> (4) Highly probable that the "alleged contemnor failed to make a reasonable and diligent effort to comply".

*Hyatt,* 621 F.3d at 692.

45.     There is, also, a difference between direct and indirect contempt. Direct contempt results when the contumacious act is committed in the presence of the Court or so near thereto as to obstruct the administration of justice, while indirect contempt is behavior that the Court did not itself witness. The nature of the contumacious act, *i.e.*, whether it is direct or indirect, is important because it determines the appropriate procedure for charging the contemnor.

46.     The history of the contempt powers of the American judiciary is marked by two trends: a shrinking of the court's power to punish a person summarily and a multiplying of the due process requirements that must otherwise be met when finding an individual to be in contempt.

### III. BACKGROUND TO ENTRY OF THE SUBJECT PROTECTIVE ORDER

47.     On January 9, 2019, in its Public Access Opinion 19-001, the Illinois Attorney General concludes, at page 10, that "[t]he more reasonable, harmonious construction of section 10-20(b)(3) of the Body Camera Act is that both a subject [*i.e.*, Ms. Young] of the recording and the officer, and their legal representatives [*i.e.*, Respondent Saulter], may obtain the recording in accordance with FOIA, regardless of whether or why it has been flagged." (*See* attached AG Public Access Opinion 19-001, Exhibit "A"). This letter was served upon, *inter alios*, CPD's General Counsel (Charise Valente) and a CPD Freedom of Information Act Officer (Sarah Brown). (Exhibit "A" at p15)

48.     On February 7, 2020, at the initial presentation on the defendants' motions to dismiss (DE 23), Respondent Saulter advised this Court that Plaintiff wanted 28 days to respond to the motion, but noted, "A particular concern for me is getting access to the body cam footage of the officers who entered my client's home. So we've made FOIA requests. We have not gotten that. That's why I want to get discovery started." (DE 43 at p2, lines 21-25) (emphasis added)

49.     This Court noted that "counsel could potentially be entitled to [the body cam footage] through FOIA [Illinois' Freedom of Information Act ("FOIA") (5 ILCS 140/1, *et seq.*)] means anyway", but the Court "want[ed] to make sure that [the body cam footage] is fully preserved, and to the extent there's any issues about locating it or that kind of stuff that those are surfaced sooner rather than later. (DE 43 at p4, lines 12-18) At this juncture in the

hearing, this Court did not express any need for a protective order; only that all of the videos be preserved and disclosed to Plaintiff.

50.     The only concern raised by the City (Mr. Berrington) was its "understanding of why counsel wants this video now as opposed to down the road is because there's already been a lot of plays in the media and, you know, things of that nature. It's gotten a lot of media attention. And we would think it would be unfair at this point to present snippets of videos that present things in an unfavorable fashion when, you know, edited in a certain way just so, you know, the case would then be presented in a mischaracterized light." (DE 43 at p5, lines 4-12) Implicit in Mr. Berrington's suggestion is that the totality of the videos, when viewed, would show the officers in a full and transparent "light". Then, another attorney for the City (Ms. Hanford) requests "a confidentiality order be in place because of the sensitive nature of the videos." (DE 43 at p5, lines 18-19)

51.     The City did not articulate what it considers "sensitive" to justify confidentiality and since Ms. Young FOIA'ed the videos and was denied access to them (see below), she did not consider them to be of such "sensitive" nature as to require a confidentiality order.

52.     It must be noted that Ms. Young's concerns relating to the "sensitivity" of the videos must (from an equity perspective) far outweigh any concern of the City—articulated or not.

53.     Prior to this February 7, 2020 hearing, the City had not filed a motion for a protective order. Rule 7(b)(1) of the Federal Rules of Civil Procedure states that "[a] request for a court order must be made by motion." FED. R. CIV. P. 7.

54.     The mechanism for protecting confidentiality is a protective order. *See* FED. R. CIV. P. 26(c); *Harrisonville Tel. Co. v. Ill. Commerce Comm'n*, 472 F. Supp. 2d 1071, 1077 (S.D. Ill. 2006); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1346 (7th

Cir. 1986). Protective orders governing the exchange and dissemination of confidential information are often entered at the outset of discovery. *Bond v. Utreras*, 585 F.3d 1061 1067 (7th Cir. 2009).

55.     The vehicle for entry of such an order is a motion.  FED. R. CIV. P. 26(c). The party moving for a protective order must establish that "good cause" exists for the Court to exercise its discretion in entering a protective order. *See* FED. R. CIV. P. 26(c). "In order to establish good cause [for a protective order], there must be a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Silva v. Fortis Benefits Ins. Co.*, 437 F. Supp. 2d 819, 827 (N.D. Ill. 2006).

56.     Though good cause is difficult to define in absolute terms, "it generally signifies a sound basis or legitimate need to take judicial action."  *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997) (quoting *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987)).

57.     To establish good cause under Rule 26(c), the moving party must present a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.l6 (1981). Good cause is established by showing that disclosure will cause a clearly defined and serious injury.

58.     Some factors to consider in determining whether good cause exists to issue a protective order are the severity and likelihood of the perceived harm, the precision of the order, the viability of less onerous alternatives, the duration of the order, the privacy interests involved, whether the information is important to the public health and safety, and whether the party benefitting from the confidentiality of the order is a public official. *See In re Alexander Grant & Co. Litig.*, 820 F.2d at 356; *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-788 (3d Cir. 1994).

59. The Court is not limited to considering these factors only, and the Court must consider the peculiar facts and circumstances of each case and balance the interests involved in making the good cause determination. *See*, *e.g.*, *Wiggins*, 173 F.R.D. at 229.

60. Rule 26(c)(1) requires that the motion for a protective order "must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." FED. R. CIV. P. 26(c)(1). The rules provide that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense…including… forbidding the disclosure or discovery[.]" FED. R. CIV. P. 26(c)(1)(A). The district court maintains the discretion to determine whether a protective order is appropriate and what degree of protection is required. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

61. The only requirement in deciding whether or not to issue a protective order is the statutory mandate of "good cause as required by Rule 26(c)". *Seattle Times Co. v. Rhinehart*, 467 U.S. at 37.

62. A court must make an independent determination—exclusive of the representations of the parties prior to the entry of a protective order.

63. The Seventh Circuit has held that "a district court is required to 'independently determine if good cause exists' before judicially protecting discoverable documents from third-party disclosure." *Salmeron v. Enter. Recovery Sys. Inc.*, 579 F.3d 787, 795 (7th Cir. 2009) (citing *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir 1994) (internal quotations and other citations omitted)). With open discovery as the norm, limiting protective orders to situations in which the moving party establishes "good cause" preserves the efficiency of the overall discovery process. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682-83 (1958).

64.    The Seventh Circuit has compared the duty of a district court to determine independently whether there is good cause to enter a protective order to the fiduciary duties a court must discharge when considering a proposed class action settlement. *See id*. (citing *Arthur R. Miller, Confidentiality, Protective Orders and Public Access to the Courts*, 105 HARV. L. REV. 427, 492 n. 322 (1991)).

65.    In deciding whether good cause exists, a "district court <u>must</u> balance the interests of the parties, taking into account the harm to the party seeking the protective order and the <u>importance of the disclosure to the nonmoving party</u>." *Rangel v. City of Chicago*, No. 10 C 2750, 2010 WL 3699991, at *1 (N.D. Ill. Sept. 13, 2010) (citing *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997)) (emphasis added). A district court may also consider "privacy interests, whether the information is important to public health and safety and whether the party benefitting from the confidentiality of the protective order is a public official." *Wiggins*, 173 F.R.D. at 229. "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Gordon v. Countryside Nursing & Rehab. Ctr., LLC*, No. 11 C 2433, 2012 WL 2905607, at *2 (N.D. Ill. July 16, 2012).

66.    Even if they agree to the entry of a protective order, the parties still bear the burden to convince the court that good cause exists. *Jepson*, 30 F.3d at 858 (citing *Pub. Citizen v. Liggett Grp. Inc.*, 858 F.2d 775, 798 (1st Cir. 1988)) (other citation omitted).

67.    Still further, "[w]here there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). Here, Respondent Saulter had to have the order entered to get the unlawfully withheld video production from the City because they improperly denied Ms. Young's FOIA requests.

68.    At no time prior to the City's request for entry of the protective order did the defendants move for a protective order and certify that a good faith effort was made to

resolve the issue (*i.e.*, production of video of the February 21, 2019 search warrant execution upon Anjanette Young) without court intervention.

69.     Neither prior to nor during this February 7, 2020 hearing did the City explain why, in the face of the Illinois Freedom of Information Act, the Illinois Law Enforcement Officer-Worn Body Camera Act, and the Illinois Attorney's General Public Access Opinion 19-001 (dated January 9, 2019), it believed it had lawfully withheld any videos from Plaintiff or why the improperly-withheld video should be subject to a protective order; the City never referenced these statutes or opinions.

70.     Here, no motion was filed, no "good cause" demonstrated, and no finding of "good cause" made by this Court.

71.     Respondent Saulter stated, "So there are a few concerns. My client's naked body was depicted on these body-worn cameras. Their office, police officers have seen this. My client has been denied access to it. She's filed several FOIA requests and appealed those.[3] That's one. Two, there is no circumstance that I can imagine that the plaintiff in a case of this nature would not be entitled to body-worn camera footage of her own home and her own body that was filmed by these officers. I can't fathom a valid argument as to why she shouldn't be entitled to her own images. It seems as if they're trying to hide something.[4] And obviously they say, well, we're concerned about snippets being played in the media. We're concerned about what's on the camera and who's seen it, inside their own department, the police department, civilians. We don't know." (DE 43 at p6, lines 3-12)

---

[3] To be clear, in this reference Mr. Saulter was referring to Ms. Young's FOIA Request which was denied (and she did not appeal that denial) and the CBS2 FOIA Request made by Samah Assad, in August of 2019 for the same material (*i.e.*, the body worn camera footage of the raid on Ms. Young's home), which was denied by the City of Chicago/Chicago Police Department. Ms. Assad did appeal that denial to the Illinois Attorney General's Office.

[4] This statement was especially prescient in light of the City's disclosures in December 2020 to the media.

72.     The Court stated, "You're going to get [all] this footage.[5] It will be subject to a confidentiality provision that among -- and you should work off of the default version that's available on the Court's website. But I think it's appropriate, particularly at this stage of the litigation, that these body cam footage be designated as confidential, meaning they can't be shared generally with people who are not involved in litigating this matter. That I think should address the concern about, you know, releasing -- these tapes are for the benefit and use through the discovery process of you and your client in pressing forward with this claim, not in creating publicity for the case or arguing the case in the media. So it's appropriate to restrict their use as confidential information in that manner, and that should resolve the defendants' concerns and should resolve the plaintiff's concerns who understandably ought to be able to see what's on these tapes." (DE 43 at pp6-7)

73.     This Court advised that after the PO is entered, "[t]hen you [the City] can produce [all[6] of] the videotapes." (DE 43 at p7, lines 12-16) No additional discovery beyond the City's production of all of the officers' body-worn camera video was authorized at that time. (DE 43 at p7, lines 21-22)

74.     On its website, litigants are advised that this Court's "policies and rules have been designated to facilitate the prompt, efficient, and equitable disposition of civil cases on the Court's docket." *See* https://www.ilnd.uscourts.gov/judge-info.aspx?79eF+7uiX7ewBj/ITKrjoA== (last visited Jan. 15, 2021). The procedures related to "Confidentiality Orders" instructs, *inter alia*, that "Counsel requesting entry of an order to

---

[5] As this Court noted at the December 22nd hearing, the City tendered only 14 of the 20 videos. At this time, neither Plaintiff nor the Court (*sua sponte*) has sought to hold the City accountable for withholding this evidence from Plaintiff.

[6] According to reporting after Respondent Saulter's disclosure of the videos to the media, Plaintiff learned the City withheld six (6) videos from its February 19, 2020 14-video production to Plaintiff and her counsel. See not provide the remaining six (6) videos. https://www.chicagotribune.com/politics/ct-lori-lightfoot-says-additional-anjanette-young-raid-videos-found-20201219-kywgngp6dvc35irvofma4mlsge-story.html (last visited Jan. 15,

preserve the confidentiality of materials disclosed in discovery [in this case, the City of Chicago] must base the proposed order on the Model Confidentiality Order contained in the Local Rules (Form LR26.2)". *Id*. (emphasis added). The parties, then, utilized, and the City modified, the Model Confidentiality Order contained in the Local Rules (Form LR 26.2) (http://www.ilnd.uscourts.gov/_assets/_documents/_forms/_online/26.2%20FORM.pdf). The Seventh Circuit has cautioned against blanket protective orders, especially in cases that do not involve sensitive information such as company trade secrets. *See*, *e.g.*, *Citizens First Nat. Bank v. Cincinnati Ins.*, 178 F.3d 943, 944-46 (7th Cir. 1999); *Jepson, Inc. v. Makita Electric Works, Ltd.*, 30 F.3d 854, 858-860 (7th Cir. 1994). Importantly, this Court's procedures instruct that, a condition precedent to entry of any such order that "Counsel shall file a motion for entry of the proposed confidentiality order, notice the motion for presentment, and separately submit the redlined copy and a clean copy of the proposed order" (emphasis added).

75.     On February 19, 2020 (prior to entry of the Protective Order), the City served fourteen (14) body camera videos. We know now that they City did not provide the remaining six (6) videos. https://www.chicagotribune.com/politics/ct-lori-lightfoot-says-additional-anjanette-young-raid-videos-found-20201219-kywgngp6dvc35irvofma4mlsge-story.html (last visited Jan. 15, 2021)

76.     The referenced videos, as articulated by Mayor Lori Lightfoot, depict treatment of Anjanette Young described as "appalling" when she "watched the video in absolute horror". The Mayor has apologized to Ms. Young and acknowledged that these videos should never have been withheld from her. Mayor Lori Lightfoot stated, "I want to tell Ms. Young (that) I am deeply sorry and troubled that her home was invaded, and that she had to face the humiliation and trauma that she suffered. That is just not right." Gregory Pratt and

---

2021) (indicating only 14 of 20 videos were turned over, which Mayor Lightfoot said was

John Byrne, Mayor *Lightfoot apologizes for wrongful police raid, said it was a mistake to try and stop CBS from airing body camera video*, Dec. 16, 2020 (https://www.chicagotribune.com/politics/ct-chicago-mayor-lori-lightfoot-apologizes-anjanette-young-raid-20201216-oxwejxkaavhtliikddyli26z34-story.html) (last visited Jan. 15, 2021).

77. On February 20, 2020, this Court entered the "Agreed Confidentiality Protective Order". (DE 35)

78. Video, film, body cam video, or any similarly representative language was <u>not</u> contained in any draft or in the final version of the proposed Agreed Order. Instead, categories of protected (*i.e.*, "confidential") materials were included (*see* below).

79. Pursuant to paragraph 2 of that Protective Order, [a]s used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER" by the producing party that falls within one or more of the following categories: (a) information protected from disclosure by statute, including the Illinois Freedom of Information Act (FOIA), 5 ILCS 140/1, *et seq.*; (b) information that reveals trade secrets; (c) research, technical, commercial or financial information that the party has maintained as confidential; (d) medical information concerning any individual; (e) personal identity information; (f) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms; (g) personnel or employment records of a person who is not a party to this case; (h) employment, disciplinary, or other information that is of a sensitive or non-public nature regarding plaintiffs, defendants, nonparty witnesses, non-party employees of the City of Chicago." (DE 35 at p2)

---

"completely unacceptable")

80.     The body cam video that Ms. Young FOIA'ed (which was denied to her) and, then, finally (partially) produced to her in this matter does not fall within any of the relevant categories set forth in subparagraphs (a) through (h):

> (a) information protected from disclosure by statute, including the Illinois Freedom of Information Act (FOIA), 5 ILCS 140/1, *et seq*.;
> (b) information that reveals trade secrets;
> (c) research, technical, commercial or financial information that the party has maintained as confidential;
> (d) medical information concerning any individual;
> (e) personal identity information;
> (f) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms;
> (g) personnel or employment records of a person who is not a party to this case;
> (h) employment, disciplinary, or other information that is of a sensitive or non-public nature regarding plaintiffs, defendants, nonparty witnesses, non-party employees of the City of Chicago.

(DE 35 at p2)

81.     To be clear, the City's request for a protective order was not done in accordance with this Court's standing order ("Counsel <u>shall</u> file a motion for entry of the proposed confidentiality order, notice the motion for presentment, and separately submit the redlined copy and a clean copy of the proposed order" (emphasis added)).

82.     Additionally, the request for a protective order was not done in accordance with Rule 7(b)(1) of the Federal Rules of Civil Procedure. FED. R. CIV. P. 7 ("[a] request for a court order must be made by motion.").

83.     Finally, this Court does not appear to make a finding on the record (on February 7, 2020) that there was "good cause" for entry of a protective order and does <u>not</u> include a finding of ""good cause as required by Rule 26(c)". *Seattle Times Co.*, 467 U.S. at 37.

## IV. BACKGROUND OF YOUNG'S FOIA REQUESTS, THE CITY'S DENIAL OF THOSE REQUESTS, AND APPLICABLE LAW

### A.      Illinois Freedom of Information Act.

84.      The City of Chicago and its police department (Chicago Police Department ("CPD")) is a "public body" under Section 2(a) the Illinois Freedom of Information Act ("FOIA") (5 ILCS 140/1, *et seq*.). 5 ILCS 140/2. ("'Public body' means all legislative, executive, administrative, or advisory bodies of the…cities…of this State….") *See Dumke v. City of Chicago*, 994 N.E.2d 573, 577 (1st Dist. 2013) ("It is undisputed that the City of Chicago is a public body….").

85.      Video is typically a "public record" under Section 2(c) the Illinois FOIA. 5 ILCS 140/2. ("'Public records' means all…recordings…recorded information and all other documentary materials pertaining to the transaction of public business, regardless of physical form or characteristics, having been prepared by or for, or having been or being used by, received by, in the possession of, or under the control of any public body.").

86.      Pursuant to the fundamental philosophy of the American constitutional form of government, it is the public policy of the State of Illinois that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of the Illinois Freedom of Information Act ("FOIA"). 5 ILCS 140/1.

87.      Restraints on access to information, to the extent permitted by FOIA, are limited exceptions to the principle that the people of this state have a right to full disclosure of information relating to the decisions, policies, procedures, rules, standards, and other aspects of government activity that affect the conduct of government and the lives of the people. 5 ILCS 140/1.

88.      Under FOIA Section 1.2, "[a]ll records in the custody or possession of a public body are presumed to be open to inspection or copying. Any public body that asserts

that a record is exempt from disclosure has the burden of proving by clear and convincing evidence that it is exempt." 5 ILCS 140/1.2.

**B.**    **Illinois Law Enforcement Officer-Worn Body Camera Act.**

89.    Under Section 20(b) of the Illinois Law Enforcement Officer-Worn Body Camera Act ("Body Camera Act") (50 ILCS 706/10-1, *et seq*.) provides, in pertinent part, the following:

> **Sec. 10-20. Requirements.**
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> (b) Recordings made with the use of an officer-worn body camera are not subject to disclosure under the Freedom of Information Act, except that:
>
>> (1) if the subject of the encounter has a reasonable expectation of privacy, at the time of the recording, any recording which is flagged, due to the filing of a complaint, discharge of a firearm, use of force, arrest or detention, or resulting death or bodily harm, shall be disclosed in accordance with the Freedom of Information Act if:
>>
>>> (A) the subject of the encounter captured on the recording is a victim or witness; and
>>>
>>> (B) the law enforcement agency obtains written permission of the subject or the subject's legal representative;
>>
>> (2) except as provided in paragraph (1) of this subsection (b), any recording which is flagged due to the filing of a complaint, discharge of a firearm, use of force, arrest or detention, or resulting death or bodily harm shall be disclosed in accordance with the Freedom of Information Act; and
>>
>> (3) upon request, the law enforcement agency shall disclose, in accordance with the Freedom of Information Act, the recording to the subject of the encounter captured on the recording or to the subject's attorney, or the officer or his or her legal representative.
>
> For the purposes of paragraph (1) of this subsection (b), the subject of the encounter does not have a reasonable expectation of privacy if the subject was arrested as a result of the encounter. For purposes of subparagraph (A) of paragraph (1) of this subsection (b), "witness" does not include a person who is a victim or who was arrested as a result of the encounter.
>
> Only recordings or portions of recordings responsive to the request shall be available for inspection or reproduction. Any recording disclosed under the Freedom of Information Act shall be redacted to remove identification of any

person that appears on the recording and is not the officer, a subject of the encounter, or directly involved in the encounter. Nothing in this subsection (b) shall require the disclosure of any recording or portion of any recording which would be exempt from disclosure under the Freedom of Information Act.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

50 ILCS 706/10-20. No Illinois court (federal or state) has interpreted the Body Camera Act. Judge Robert M. Dow, Jr. mentions the Body Camera Act in a footnote in *Illinois v. City of Chicago*, No. 17-cv-6260, at \*17 n.4 (N.D. Ill. Aug. 16, 2018).

**C.    Attorney General Public Access Opinion 19-001.**

90.    In Public Access Opinion 19-001, dated January 9, 2019, the Illinois Attorney General concludes, at page 10, that "[t]he more reasonable, harmonious construction of section 10-20(b)(3) of the Body Camera Act is that both a subject [*i.e.*, Ms. Young] of the recording and the officer, and their legal representatives [*i.e.*, Respondent Saulter], may obtain the recording in accordance with FOIA, regardless of whether or why it has been flagged." (*See* attached AG Public Access Opinion 19-001, Exhibit "A")

**D.    Anjanette Young's November 2019 FOIA Request for Video from Search.**

91.    Almost 10 months after the Illinois Attorney General issued its Public Access Opinion 19-001, on November 1, 2019, Anjanette Young (individually) submitted a FOIA request to CPD for "any and all video recorded from officers' body worn cameras during a search warrant that was executed on my home, 164 N. Hermitage Ave., 1st floor apartment, on February 21, 2019." (*See* Exhibit "B" attached hereto)

92.    The above request specified that Ms. Young was the "subject captured in the body worn camera video" and is "requesting video from the body worn camera of each officer, respectively, who responded and was on scene"; she provided the warrant number, 19SW5247, to aid CPD's search. *Id*.

93.    On November 4, 2019, CPD acknowledged receipt of the request and assigned reference number P537723-110419 to the matter. (*See* Exhibit "B" attached hereto)

94. On November 8, 2019, CPD asked Ms. Young to provide a "Government issued ID in PDF form", which was sent that same day in form of her government issued driver's license. (*See* Exhibit "C" attached hereto)

95. On November 12, 2019, CPD sought an extension of five business days. (*See* Exhibit "D" attached hereto)

96. On November 19, 2019, CPD denied the request in its entirety pursuant to Sections 7(1)(d)(i) and (ii) of FOIA. (*See* Exhibit "E" attached hereto) That letter was authored by P. Rodriguez, CPD Freedom of Information Officer. The letter cites the section of the Chicago Municipal Code related to the Civilian Office of Police Accountability ("COPA") (Chicago Municipal Code 20-78-100, *et seq*.) and the City's administrative investigations into allegations of police misconduct.

97. In its denial letter, which came nine months after the incident occurred, CPD claimed that it was still conducting an "administrative investigation" into the incident and that "disclosure of such file will interfere with our pending and active investigation into this matter such that our investigation is compromised if witnesses who have yet to meet with our office are able to review the materials in our possession, including but not limited to the statements of other witnesses, accused, and complainants."

98. Courts, including the Illinois First District Appellate Court, have repeatedly held that a law enforcement agency cannot withhold records under Section 7(1)(d) simply because an investigation is open or ongoing. *Kelly v. Village of Kenilworth*, 2019 IL App (1st) 170780.

99. The asserted exemption does not apply to records related to "administrative investigations." Rather, the plain text of the exemptions makes clear that they only apply to "law enforcement proceedings" and "active administrative enforcement proceedings."

100.    There have never been any law enforcement proceedings contemplated against anyone in connection with the raid of Ms. Young's home.

101.    CPD does not claim that there is an ongoing criminal investigation under Section 7(1)(d)(vii).

102.    There have never been any active administrative enforcement proceedings against anyone in connection with the raid of Ms. Young's home.

103.    Even if "administrative investigations" qualified for the exemption, the asserted exemptions only apply when a public body can prove by clear and convincing evidence that release of the requested records "would interfere" with such investigations.

104.    Courts have repeatedly rejected CPD's position that release of records from many months after an incident will interfere with any investigation by supposedly impacting the future statements of witnesses who had not yet been interviewed. CPD was aware of these rulings at the time it denied the request.

## V. PROCEDURAL HISTORY

105.    On August 16, 2019, the plaintiff filed her original complaint at law. (DE 1) An amended complaint was filed on October 12, 2019. (DE 15)

106.    As set forth above, in November 2019, Ms. Young made a proper request for the body cam video of the search on November 1st, which the City improperly denied eighteen (18) days later on November 19th.

107.    On February 7, 2020, a status hearing and an initial hearing was held on the defendants' motion to dismiss. (DE 23-25). During that hearing, counsel for the plaintiff (Respondent Saulter) advised the Court that prior FOIA requests to the City for body cam footage of the officers entering Ms. Young's home had been denied. Then, while the City continued to improperly deny Ms. Young access to the body cam video, the Court acknowledged that Ms. Young and her counsel were already potentially entitled to the body

cam video through Illinois law ("FOIA" was referenced by this Court at the time (DE 43 at p4, line 14)).

108.    Despite Ms. Young's entitlement to the videos under FOIA, Body Camera Act, and Public Access Opinion 19-001, the Court, in the absence of any motion seeking a protective order being filed and articulating "good cause", directed the parties to make the videos subject to a protective order.

109.    On February 20, 2020, this Court entered the "Agreed Confidentiality Protective Order". (DE 35)

110.    On February 19, 2020, the City served fourteen (14) body camera videos.

111.    On February 20, 2020, this Court entered the "Agreed Confidentiality Protective Order". (DE 35)

112.    On March 10, 2020, this Court granted the plaintiff's request to voluntarily dismiss her claims without prejudice, pursuant to Rule 41(a)(1)(A)(i), to allow her to re-file in state court. (DE 37)

113.    On December 14, 2020, the defendants filed their Joint Emergency Motion to Enjoin CBS From Violating the Court's Confidentiality Order, and Motion for Sanctions Against Plaintiff. (DE 38)

114.    On December 16, 2020, the defendants filed their Supplement in Support of Its Motion for Sanctions. (DE 42-43)

115.    On December 18, 2020, the defendants filed their Motion to Withdraw Their Motion for Sanctions Against Attorney Saulter. (DE 49)

## VI. ANALYSIS

116.    As set forth above, when looking to the issue of a civil contempt, the following must be established by "clear and convincing evidence":

> (1) Highly probable that "a court order set forth an unambiguous command";

(2) Highly probable that "the alleged contemnor violated that command";

(3) Highly probable that "the violation was significant, meaning the alleged contemnor did not substantially comply with the order"; <u>and</u>

(4) Highly probable that the "alleged contemnor failed to make a reasonable and diligent effort to comply"

*Hyatt,* 621 F.3d at 692.

A.      <u>**The February 20, 2020 Order Did Not Set Forth an Unambiguous Command.**</u>

117.    Section 1 (Scope) of the "Agreed Confidentiality Protective Order" provides that "[a]ll materials produced or adduced in the course of discovery, including discovery ordered by the Court…shall be subject to this Order concerning Confidential Information as defined" therein. (DE 35 at p1)

118.    Section 2 (Confidential Information) of the "Agreed Confidentiality Protective Order" provides that "'Confidential Information' means information designated as 'CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER' by the producing party that falls within one or more of the following categories: (a) information protected from disclosure by statute, including the Illinois Freedom of Information Act (FOIA), 5 ILCS 140/1, *et seq*.; (b) information that reveals trade secrets; (c) research, technical, commercial or financial information that the party has maintained as confidential; (d) medical information concerning any individual; (e) personal identity information; (f) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms; (g) personnel or employment records of a person who is not a party to this case; (h) employment, disciplinary, or other information that is of a sensitive or non-public nature regarding plaintiffs, defendants, nonparty witnesses, non-party employees of the City of Chicago." (DE 35 at p2)

119.    Here, the 14 of 20 videos of the raid on Ms. Young's home that produced by the City on February 19, 2020 do not fall within any of the subparagraphs (a) through (h). To the extent that it fell within any of these categories, the only potentially applicable category is (a): "information protected from disclosure by statute, including the Illinois Freedom of

Information Act (FOIA), 5 ILCS 140/1, *et seq*." However, as set forth above, Illinois FOIA and the Body Camera Act (and the AG's Public Access Opinion 19-001 analyzing the same) demonstrate that, as to Ms. Young, those videos were not subject to protection from disclosure to her and, thus, not properly covered by the Protective Order.

120. On this issue, the City of Chicago through Mayor Lightfoot has now admitted that these videos were improperly withheld from Ms. Young when the City denied her November of 2019 FOIA Request.

121. Section 3(a) (Designation) of the "Agreed Confidentiality Protective Order" provides that "Applying the marking "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order." (DE 35 at p3)

122. If, and only if, the material is marked and subject to the text of the PO, then Section 5 (Protection of Confidential Material) of the "Agreed Confidentiality Protective Order" provides whether material may be disclosed. (DE 35 at pp4-5)

123. Section 9 (Challenges by a Party to Designation as Confidential Information) of the "Agreed Confidentiality Protective Order" provides that "[t]he designation of any material or document as Confidential Information is subject to challenge by any party…." (DE 35 at p6) This section presumes the designating party acted in "good faith" when it designated something "Confidential Information". Here, based on the transcript of the February 7, 2020 hearing, both Respondent Saulter and the Court appeared to recognize Ms. Young should have received the videos outside of discovery in the case. (DE 43 at p2, lines 21-25; DE 43 at p4, lines 12-18; DE 43 at p6, lines 3-12)

124. Section 14 (Obligations on Conclusion of Litigation) of the "Agreed Confidentiality Protective Order" provides that the "Order shall remain in force after

dismissal" and "[w]ithin sixty-three days after dismissal" all documents designated confidential shall be returned to the producing party or destroyed. (DE 35 at p9)

125.     Section 16 (No Prior Judicial Determination) of the "Agreed Confidentiality Protective Order" provides that "[t]his Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. <u>Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information by counselor the parties is entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue</u>." (DE 35 at p10)

126.     Section 18 (Public Disclosure of Documents Designated "Confidential") of the "Agreed Confidentiality Protective Order" provides, "This Order prohibits the disclosure of any document designated as a 'confidential' subject to the limitations of Section 5(b). Any party or counsel seeking to use or disclose confidential information for any reason other than for purposes of this litigation, including for public disclosure, will not use the documents designated as 'Confidential' but shall instead comply with the requirements set forth under the Illinois Freedom of Information Act ('IFOIA'), 5 ILCS 140/et., to obtain the desired documents from the proper public body." (DE 35 at p10)

127.     Here, prior to her receipt of the videos and prior to entry of the protective order and prior to Ms. Young (through Respondent Sautler) disclosing the videos to the media, Ms. Young already properly complied with IFOIA and the City had already improperly denied her FOIA requests when she sought "to obtain the desired documents from the proper public body."

128.     Given the aforementioned history, asking Ms. Young to re-submit a request to the CPD Freedom of Information Officer for "any and all video recorded from officers' body

worn cameras during a search warrant that was executed on my home, 164 N. Hermitage Ave., 1st floor apartment, on February 21, 2019" would constitute a pointless exercise.

129.    Stated differently, it would be exercise in futility for Ms. Young (and her attorney, Respondent Saulter) to comply with Section 18 by doing what Ms. Young had already done and the City had already (now admittedly) improperly denied.

130.    The Seventh Circuit has recognized that a protective order "does not insulate the information from disclosure if disclosure is otherwise proper under applicable rules of law." *In re Matter of Continental Illinois Securities Litigation*, 732 F.2d 1302, 1311 (7th Cir. 1984).

131.    The transcript of the February 7, 2020 hearing, which precipitated the entry of the Protective Order, was not sought by any party until December 2020. In fact, On December 22nd, Respondent Saulter specifically stated that he did not have the benefit of the "eight-page transcript from [the] February 7, 2020 hearing" when he released the videos. (DE 52 at p6, lines 11-25) Respondent continued, "Before I made the decision to release the videos, I did go back and review the protective order that this Court entered on February 20th of 2020; but I did not have the eight-page transcript, and I was not able to recall with specificity the entire discussion that this Court and the parties had during the presentment of the defendants' motion to dismiss on February 7th of 2020." (DE 52 at p7, lines 12-18) (emphasis added)

132.    As set forth above, the Protective Order is ambiguous. Respondent Saulter is saying that the Protective Order itself does not set forth an unambiguous command.

**B.    Respondent Saulter Did Not Violate an Unambiguous Command.**

133.    Respondent Saulter told this Court on December 22, 2020 that he was the individual who released "the 14 body-worn camera videos that were tendered to [him] in discovery by the defendant, the City of Chicago, which depicted [his] client, Anjanette

Young's body and home during the raid at her home on February 21st of 2019." (DE 52 at p6, lines 12-16) Respondent Saulter advised the Court that, after reviewing the recently-transcribed February 7th [2020] hearing (DE 43), he understands that he "should have handled this situation differently." (DE 52 at p6, lines 17-23)

134.    However, "[b]efore [he] made the decision to release the videos, [Mr. Saulter] did go back and review the protective order that this Court entered on February 20th of 2020; but [he] did not have the eight-page transcript, and I was not able to recall with specificity the entire discussion that this Court and the parties had during the presentment of the defendants' motion to dismiss on February 7th of 2020." (DE 52 at p67 lines 12-18)

135.    Respondent Saulter stated that he "should have come back before this Court and sought a modification of the protective order that this Court entered on February 21, 2020." (DE 52 at p67 lines 21-23)

136.    However, given the ambiguity of the protective order, Respondent Saulter relied upon his training and experience, his review of the protective order (DE 35), and his understanding of the relevant rules and law.

137.    Without attempting to waive any attorney-client privilege or disclose any privileged communication, Respondent Saulter would advise this Court that prior to his decision to release the videos to the media—he did seek legal advice from a more experienced (than himself) Illinois attorney, who routinely practices before the Northern District of Illinois regarding his analysis of the protective order and whether or not the subject videos were properly designated as confidential by the City and generally whether the videos were covered by the Protective Order.

138.    This advice was provided without the benefit of the February 7, 2020 transcript.

139.    Again, given the aforementioned history, asking Ms. Young to re-submit a request to the CPD Freedom of Information Officer for "any and all video recorded from officers' body worn cameras during a search warrant that was executed on my home, 164 N. Hermitage Ave., 1st floor apartment, on February 21, 2019" would constitute a pointless exercise. Stated differently, it would be exercise in futility for Ms. Young (and her attorney, Respondent Saulter) to comply with Section 18 by doing what had already done. The Seventh Circuit has recognized that a protective order "does not insulate the information from disclosure if disclosure is otherwise proper under applicable rules of law." *In re Matter of Continental Illinois Securities Litigation*, 732 F.2d 1302, 1311 (7th Cir. 1984).

140.    As set forth above, Respondent Saulter did not violate an unambiguous command related to the Protective Order.

## C.    Respondent Saulter Attempted to Comply with the Order as He Understood It.

141.    The City improperly denied Ms. Young's FOIA request. The City requested a protective order when it knew it was improper. The City failed to file a motion for a protective order. The City failed to provide facts in support of any position that "good cause" required entry of a protective order. The City improperly designated the 14 (of 20) videos it produced as "Confidential Information". The City improperly withheld 6 videos from its production to the plaintiff. The City, which originally sought sanctions against Respondent Saulter, withdrew its motion for sanctions when (following the media's exposure of the egregious raid) it recognized all of the problems it created. Finally, the City asked this Court to refrain from imposing any sanction on Respondent Saulter.

142.    Based on the aforementioned, the alleged violation was not significant to the City. In fact, the City stated in its motion to withdraw the following: "The Mayor believes and we agree that we should give Attorney Saulter the benefit of the doubt that he did not appreciate that the court's confidentiality order continued in full force and effect, even after

the voluntary dismissal of the case in March 2020. For these reasons, we withdraw our motion for sanctions against Attorney Saulter and urge no action against him by the court." (DE 49 at ¶ 4)

143.    However, the Court indicated its concern related to "vindication of its -- and its own interest institutionally with the enforcement -- compliance with and enforcement of its orders". (DE 52 at p19, lines 14-17)

144.    As described herein, Respondent Sautler did not willfully abuse the judicial process or otherwise act in bad faith. In fact, Respondent Saulter contends that the violation was not "significant" (as defined by the Seventh Circuit in *Hyatt,* 621 F.3d at 692), in that he <u>did</u> attempt to comply with the Protective Order.

**D.    <u>Respondent Made a Reasonable and Diligent Effort to Comply with the Order.</u>**

145.    Finally, as previously set forth herein, Respondent Saulter has explained how he did not fail to make a reasonable and diligent effort to comply. In fact, Respondent Sautler believed that he had complied with the protective order.

146.    In fact, as stated herein—he sought independent legal counsel regarding these issues from an attorney more experienced than himself.

147.    However, with the benefit of reading the February 7, 2020 transcript, Respondent Saulter indicated his understanding how should have approached the matter differently to clarify the ambiguity.

## V. CONCLUSION

148.    Based upon the foregoing analysis, there are factual, legal, and equitable reasons that explain how Respondent Saulter's conduct that does not warrant issuance of a rule to show cause, does not warrant sanctions, and does not warrant drawing up a petition for indirect criminal/civil contempt.

149.    As such, this Court should not sanction Respondent Saulter and, further, should not issue a rule to show cause.


Respectfully submitted,

SANDBERG LAW OFFICE, P.C.


By:     /s/ Craig M. Sandberg_____
        CRAIG M. SANDBERG
        P.O. Box 182
        Deerfield, Illinois 60015
        Tel: (833) 726-3237
        Fax: (312) 466-1100
        Email: craig@sandberglaw.com
        ARDC No. 6257836


LAW OFFICES OF RAHSAAN A. GORDON, P.C.


By:     /s/ Rahsaan A. Gordon
        RAHSAAN A. GORDON
        333 West Wacker Drive, Suite 500
        Chicago, Illinois 60606
        Tel: (312) 422-9500
        Fax: (312) 422-9507
        Email: rg@attorneygordon.com
        ARDC No. 6274354

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

**1. Respondent Keenan J. Saulter's Supplemental Brief Related to Issues Raised and/or Discussed on December 22, 2020.**

were served pursuant to the district court's ECF system as to ECF filers.

By:   /s/Craig M. Sandberg
           CRAIG M. SANDBERG